UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

      IGOR Y. MELNIK,                              Chapter 7
                                                  Case No. 17-60103

                                    Debtor.

_____

DEEPIKA REDDY AND PRATAP REDDY,        Adv. Pro. No. 17-80001

                                    Plaintiffs,

v.

IGOR Y. MELNIK,

                                    Defendant.

_____

APPEARANCES:

*Deepika Reddy and Pratap Reddy*
*Pro se Plaintiffs*
7338 Dartmoor Crossing
Fayetteville, New York 13066

*Whitelaw & Fangio*                          *Mary Lannon Fangio, Esq.*
*Attorneys for Debtor-Defendant*         *Thomas L. Kennedy, Esq.*
247–259 W. Fayette Street
Syracuse, New York 13202

Honorable Diane Davis, United States Bankruptcy Judge

**MEMORANDUM-DECISION AND ORDER**

*I.*    *Introduction*

      The *pro se* plaintiffs, Dr. Deepika Reddy and Dr. Pratap Reddy (collectively, "Plaintiffs"),

commenced this adversary proceeding against the debtor-defendant, Dr. Igor Melnik ("Debtor"),

in order to prevent Debtor from discharging the debt he owes to them in his chapter 7 bankruptcy

case.[1] Specifically, on May 1, 2017, Plaintiffs filed an adversary complaint setting forth causes of action including § 523(a)(2)(A) and (a)(6) (the "Complaint"). (ECF Adv. No. 1.)[2] Following a one-day trial on March 13, 2018, the Court provided the parties with an opportunity to submit post-trial memoranda of law. Plaintiffs submitted their memorandum of law on April 12, 2018 ("Plaintiffs' Memorandum," ECF Adv. No. 33), and Debtor, through counsel, submitted his memorandum of law on April 13, 2018 ("Debtor's Memorandum," ECF Adv. No. 34). The Court then reserved its final decision. After consideration of the parties' arguments, the documentary and testamentary evidence presented, and post-trial memoranda of law, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable here by Rule 7052. For the reasons set forth below, the Court concludes that Plaintiffs have not met their burden of proof under § 523(a), and thus the debt owed to them by Debtor is dischargeable.

## II.    Jurisdiction

The Court has jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and (b). This is a core proceeding which this Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(I).

## III.    Factual Background

On February 3, 2017, Debtor filed a voluntary petition for chapter 7 relief. (ECF No. 1.) Under Paragraph 4.2 of Official Form 106E/F, titled "Schedule E/F: Creditors Who Have Unsecured Claims" ("Schedule E/F"), Debtor listed the debt he owes to Plaintiffs in the amount of $557,250.00. Debtor marked the debt as "contingent, unliquidated, [and] disputed." On

---

[1] Unless otherwise indicated, all chapter and section references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and all rule references are to the Federal Rules of Bankruptcy Procedure.
[2] Docket entries in the adversary proceeding will be cited as "ECF Adv. No. __," while docket entries in Debtor's chapter 7 bankruptcy case will be cited as "ECF No. __."

Attachment 1 to Schedule E/F, he described the debt as a business-related claim for breach of contract in connection with his purchase of a dental practice and a related commercial lease. Under Part 4, Paragraph 9, of Official Form 106Sum, titled "Summary of Your Assets and Liabilities and Certain Statistical Information" ("Summary of Assets"), Debtor listed a pending state court action brought by Plaintiffs against Debtor in the Onondaga County Supreme Court in Syracuse, New York, under Index Number 2016-1265 (the "State Court Action"). Under Paragraph 16 of the Summary of Assets, Debtor disclosed that he had spent approximately $35,000.00 in legal fees from May 5, 2016, to the date of filing for defense representation in legal actions, including the State Court Action, Plaintiffs' related eviction action, and an administrative licensure proceeding. Under Paragraph 27 of the Summary of Assets, Debtor indicated that, within 4 years prior to the date of filing, he had owned the dental practice that was no longer operating.

Debtor's bankruptcy filing was precipitated by the State Court Action, together with Plaintiffs' other legal proceedings against him. While the parties disagree as to the significance of certain facts in relation to Plaintiffs' nondischargeability causes of action, they do not disagree as to the facts themselves. The details related to the parties' history and dealings with one another and with third-parties involved in their business transaction have been documented extensively in pre-trial depositions and reiterated during trial. (Pls.' Ex. T; Def.'s Exs. 11 & 12; Trial Tr., ECF Adv. No. 37.) Without belaboring the parties' history, given that their recollections and accounts of the past are so similar, the Court will set forth only those findings of fact necessary to provide context and support for its decision.

Both Dr. Reddy and Debtor are foreign-educated dentists who later trained and became licensed professionals in the United States. In 2004, Dr. Reddy purchased and began to operate her own dental practice in East Syracuse, New York. (Def.'s Ex. 11, 13; Trial Tr. 16.) In 2009 or

2010, Dr. Reddy became the subject of a professional disciplinary action, wherein she entered into a consent order that restricted her right to practice and prohibited her from performing certain dental procedures.[3]

Dr. Reddy testified that the disciplinary action and media coverage surrounding the same caused her to suffer from post-traumatic stress disorder ("PTSD"), which her psychiatrist diagnosed in 2012. (Def.'s Ex. 11, 20.) In 2015, Dr. Reddy's medical circumstances and physician's advice compelled her to sell her dental practice. (Trial Tr. 20.) By that time, Dr. Reddy had lost a significant number of patients and she was operating the practice only one to two days per week. (Def.'s Ex. 11, 16.)

After seeing an advertisement on the New York State Dental Association's website, Dr. Reddy hired Henry Schein Professional Practice Transitions, a division of Henry Schein Financial Services LLC ("Henry Schein"), to provide practice transition experts who would work on her behalf to value, market, and sell the practice as a going concern. (Trial Tr. 24–25.) Dr. Reddy and her husband, the co-plaintiff Dr. Pratap Reddy, contacted Henry Schein and they were placed in touch with its local representative, Donna Bambrick ("Bambrick"). (Trial Tr. 25.) In connection with Henry Schein's services, Plaintiffs agreed to pay 10% of the sale price to Henry Schein upon closing. (Compl. ¶ 14.)

Due to her PTSD, Dr. Reddy decided that it was in her best interest to let her husband handle the paperwork and serve as the principal contact for Bambrick. (Trial Tr. 25.) Dr. Reddy testified that she did not fill out the Practice Valuation Questionnaire dated May 20, 2015 (Pls.'

---

[3] Dr. Reddy conceded that she entered into the consent order in settlement of the misconduct charges, but she testified that she did so reluctantly because she believed she had been unfairly targeted by a competitor and the accusations against her were unfounded. (Trial Tr. 20–23.) Thereafter, Dr. Reddy commenced a civil action in federal court against certain area dentists and members of the New York State Department of Education's Office of Professional Discipline wherein she alleged, *inter alia*, that she was not given a full and fair opportunity to defend herself. (Def.'s Exs. 1 & 2.) According to Dr. Reddy, this action was dismissed on procedural grounds. (Trial Tr. 63.)

Ex. E), which was provided by Henry Schein to Debtor on or about May 11, 2016, and she did not believe that Dr. Pratap Reddy did either (Def.'s Ex. 11, 28–30). Rather, she thought that the writing belonged to Bambrick. (Def.'s Ex. 11, 28.) In exchange for a fee of approximately $2,500.00, Henry Schein evaluated Dr. Reddy's practice and assigned it a going-concern value of $202,000.00. (Trial Tr. 27–28.)

In late 2015, while working as a dentist at Aspen Dental, Debtor contacted Henry Schein through Bambrick. A colleague advised him that Dr. Reddy's practice was for sale and he provided Debtor with Bambrick's contact information. (Pls.' Ex. T, 5–6; Trial Tr. 121–22.) At that time, Debtor had approximately five years of experience in general dentistry but he had no independent business experience. (Trial Tr. 124.) He testified during his deposition, however, that it was his dream to own his own practice and he was confident in his ability to do so. (Pls.' Ex. T, 6.)

Debtor was divorced for the second time from his former spouse, Lidiya Melnik ("Lidiya"), who had also been a dentist in the Ukraine. Unlike Debtor, she did not become a licensed dentist in the United States and she was working as a dental hygienist in New York City, where she resided with the parties' minor son. Although they were divorced, Lidiya planned to and did in fact move from New York City to Syracuse, New York, along with their son, to work with Debtor at the practice. (Pls.' Ex. T, 16–17; Trial Tr. 125.) Debtor testified that he and Lidiya were planning to work together to build a successful dental business and that they were looking forward to a new start. (Trial Tr. 143.)

After Henry Schein introduced Plaintiffs to a prospective purchaser who had lost his dental license in Ohio and was not licensed to practice dentistry in New York, Plaintiffs advised Henry Schein and Bambrick directly that they would only meet with serious buyers. (Trial Tr. 27.) On January 13, 2016, Bambrick contacted Dr. Pratap Reddy by e-mail and stated, "Congratulations! I

think we found a wonderful doctor and family to care for the patients of your wife. I will move forward on completing this sale and keep you informed." (Pls.' Ex. B.)

When Henry Schein introduced Debtor to Plaintiffs, they assumed that he was a "perfect match" for Dr. Reddy's practice. (Trial Tr. 29.) While Dr. Reddy knew that Debtor did not have experience running his own practice since he worked for Aspen Dental in a clinical setting, she was comfortable with his dental skills and his general knowledge of dentistry. (Trial Tr. 29–30.) According to Dr. Reddy, Debtor indicated that he planned to work two to three days per week at the practice and he had approximately $100,000.00 in cash available to use for operating expenses while he generated new business. In contrast, according to Debtor, he indicated to Bambrick and/or Plaintiffs that he planned to work one to two days a week at the practice and he had approximately $80,000.00 in cash available for the few months of operation of the practice. Moreover, Plaintiffs understood that Lidiya, whom he referred to as his wife, would also work at the practice in a dual role as the office manager and part-time hygienist. (Trial Tr. 31.) Dr. Reddy and Debtor met in person twice before he made a formal offer to purchase the practice, and each time the subject matter of their discussions was limited to general dentistry and did not include business or financial matters. (Def.'s Ex. 11, 21–27.)

On multiple occasions, Dr. Reddy admitted that she had little to do with either the initial practice evaluation or the vetting of Debtor's offer. In fact, Dr. Reddy testified that she relied entirely on the judgment and recommendations of Bambrick and other Henry Schein representatives. (Def.'s Ex. 11, 48; Trial Tr. 38.) Dr. Reddy indicated that Henry Schein informed Plaintiffs that Debtor would be very comfortable running the practice and that it would be a family endeavor. (Def.'s Ex. 11, 35–36.) Dr. Reddy did not actually meet Lidiya until after she sold the practice to Debtor. (Def.'s Ex. 11, 40; Trial Tr. 40.) Henry Schein also informed Plaintiffs that

Debtor was "financially fine," which, in part, made him a "pre-approved client." (Def.'s Ex. 11, 39.) Debtor similarly trusted Henry Schein and Bambrick to steer him to a "good practice." (Pls.' Ex. T, 8–9.)

On March 28, 2016, Dr. Reddy and Debtor entered into a Practice Purchase Agreement (the "PPA"), whereby Debtor agreed to purchase Dr. Reddy's dental practice assets for the sum of $202,000.00. (Pls.' Ex. C.) The PPA required the purchase price to be paid in cash or a cash equivalent on the closing date, which was March 24, 2016, at the latest.[4] The assets included, but were not limited to, the office furnishings, fixtures, and equipment, dental equipment and supplies, office equipment and furniture, computer hardware and software, patient records and files, and personal goodwill. The assets were sold "as is," and each party made certain representations, acknowledgements and/or warranties to the other. Dr. Reddy's practice was located in a commercial building owned by Dr. Pratap Reddy. On March 28, 2016, Dr. Pratap Reddy and Debtor entered into a Commercial Lease Agreement (the "Lease"), whereby Dr. Pratap Reddy agreed to rent the office space to Debtor for a defined term from April 1, 2016, through March 31, 2023, in exchange for monthly rent in the amount of $4,750.00 starting on March 2, 2017, subject to a 3% annual increase. (Pls.' Ex. J.)

With the assistance of Bambrick, Debtor initially applied for commercial loans from Bank of America and TD Bank. (Trial Tr. 127.) He testified that those loans were denied not because of his credit rating and history, but rather because of the negative publicity attached to the practice following Dr. Reddy's disciplinary proceeding. (Trial Tr. 127–28.) He further testified that Bambrick approached him with an offer from Dr. Pratap Reddy to provide private financing, which he immediately accepted. According to Plaintiffs, however, Henry Schein approached them about

---

[4] Although this would appear to be a typographical error, it is in fact what the PPA provides.

financing Debtor's purchase of the practice until he could obtain commercial financing in order to ensure a successful transition and continued service to the existing patients. (Def.'s Ex. 11, 43–45.) Ultimately, Plaintiffs agreed to loan Debtor funds in the principal amount of the purchase price set forth in the PPA, plus interest at a rate of 6% per annum.

Between March 23, 2016, and April 1, 2016, Debtor executed a Promissory Note ("Note") and Personal Guaranty ("Guaranty") in connection with Plaintiffs' loan. (Pls.' Ex. L.) The Note provided for repayment in eighty-four equal, consecutive, monthly payments of $2,950.93. On April 1, 2016, Dr. Reddy and Debtor entered into a Credit and Security Agreement (the "CSA"), whereby Debtor granted Dr. Reddy a security interest in certain collateral to secure payment of the obligations described in the Note. (Pls. Ex. K.)

With respect to the loan, Dr. Reddy testified that she did not know whether Debtor provided a financial statement to Henry Schein or what type of due diligence was done, but she and her husband relied on Bambrick's assurances that Debtor was financially sound. (Def.'s Ex. 11, 46, 50–52, & 62.) Dr. Pratap Reddy confirmed that Debtor did not provide Plaintiffs with any written financial information. Dr. Pratap Reddy testified that he did not know that Debtor had a child support obligation when Plaintiffs agreed to extend Debtor financing. (Trial Tr. 81.) Debtor, however, had a child support obligation at that time in the approximate amount of $900.00.

Notwithstanding the length of the repayment term provided for in the Note, based on Bambrick's representations, Dr. Pratap Reddy understood the transaction would be for short-term financing until Debtor could secure a bank loan with the assistance of Henry Schein. (Def.'s Ex. 12, 26.) Bambrick also represented to Dr. Pratap Reddy that Debtor had an excellent credit score and that he had sufficient funds in the bank to operate the practice for the first few months. (Def.'s Ex. 12, 28–29.)

At this point in time, the parties' accounts differ somewhat as to Lidiya's involvement in the loan transaction. According to Debtor, he and/or Lidiya informed Bambrick that they were "not officially married," but that Lidiya was ready to be part of the practice. (Trial Tr. 158, 164.) Plaintiffs, however, maintain that they did not know that Debtor and Lidiya were divorced until after they agreed to provide the loan. Plaintiffs also were not informed by Debtor or Bambrick that Debtor had an ongoing child support obligation when they agreed to finance Debtor's purchase of the practice. Debtor testified that Plaintiffs never asked for the child support information prior to making the loan. (Trial Tr. 190.)

Debtor made the initial payment to Plaintiffs for the security deposit and the first and last month's rent, which he recollected as totaling $9,500.00. (Trial Tr. 134.) Debtor made additional payments to Plaintiffs, which he believed totaled approximately $24,900.00. (Trial Tr. 134.) Prior to working at the practice, Debtor applied for but had not yet obtained participating provider status with nearly a dozen insurance companies. (Trial Tr. 136.) He initially worked two days a week at the practice, three days a week at Aspen Dental, and weekends at a Wilson Dental. (Trial Tr. 144.) He also placed advertisements in the local newspapers and on the internet in order to generate new business at the practice. (Trial Tr. 200.)

Based on the representations made to him by Plaintiffs and Bambrick, Debtor believed that he would not have to make a capital investment in the office for approximately five years. (Trial Tr. 147–48.) Within weeks of acquiring the practice, however, Debtor realized that he was not going to be able to succeed. According to Debtor, the practice had been misrepresented to him by Henry Schein, Bambrick, and Plaintiffs. The number of active patients was much lower than he expected, the equipment was outdated or, in some cases, not functional at all, and he had staffing issues, including with Donna Walker, Dr. Reddy's former dental hygienist. In addition, he faced

exhaustion and Lidiya decided to return to New York City after seeing the state of the practice and experiencing certain uncomfortable exchanges with Plaintiffs. (Pls.' Ex. T, 44; Trial Tr. 134–36.) The parties communicated in person and via e-mail, and it became clear to Debtor that Plaintiffs were still communicating with Dr. Reddy's former hygienist, Donna Walker, whom Debtor had unsuccessfully tried to retain. (Trial Tr. 199.)

Debtor testified that, by June 2016, he realized that he had jeopardized his income and benefits from Aspen Dental because he had moved to part-time status. He was too exhausted to continue working seven days a week as a dentist and he therefore had to give up his part-time weekend position at Wilson Dental as well. He further testified that he was not able to cover his expenses at the practice and he was not making a profit as he anticipated he would when he purchased the practice and he became overwhelmed. (Trial Tr. 134–35.) In addition, his student loan and child support payments had increased because of his increase in income due to working seven days a week in order to financially carry the obligations of the practice. By August 2016, Debtor could not afford the payments under the Lease or Notice and he defaulted on his obligations. (Pls.' Ex. T, 86.) Shortly thereafter, Dr. Pratap Reddy sought to evict Debtor from the business premises.

Debtor then returned to Bambrick and he hired Henry Schein to resell the practice. He did not ask for an updated practice evaluation and he accepted Henry Schein's new valuation and agreed to market the practice for $160,000.00. (Pls.' Ex. T, 163; Trial Tr. 214–15.) Debtor reduced the asking price because he wanted to sell it as quickly as possible. (Trial Tr. 215.) He eventually received two offers, including one from Thomas B. Nolan, D.D.S. ("Dr. Nolan"), which Debtor felt was reasonable under the circumstances. (Trial Tr. 215.) Dr. Nolan submitted a Business Offer to Purchase the practice on September 14, 2016, for $125,000.00. (Pls.' Ex. H.) Dr. Nolan's offer

contemplated a closing date of September 30, 2016. Debtor agreed to permit Dr. Nolan to finance $100,000.00 of the purchase price and to take back a promissory note, as Plaintiffs had done for him. That note, however, would have required monthly interest only payments for six months, followed by principal and interest payments thereafter with a balloon payment due on or before the five year mark. Dr. Nolan's offer was also subject to his ability to obtain a lease from Dr. Pratap Reddy for the business premises at one-half of the rent paid by Debtor for two years with a five year option to renew at an agreed upon rent. Dr. Nolan required that the lease contain a right of first refusal on the commercial building and a guarantee from Dr. Pratap Reddy that he would sell the building to Dr. Nolan. It was understood by Dr. Nolan that both Debtor and Dr. Reddy would have to be parties to the contract and both would have to accept and execute his offer.

In late September 2016, following Debtor's receipt of Dr. Nolan's offer, Debtor and/or Bambrick approached Plaintiffs and a series of communications occurred between Debtor, individually or through his retained counsel, Dr. Reddy, and Bambrick regarding Dr. Nolan's offer and the monetary difference between that offer and the balance due to Plaintiffs from Debtor under the Lease and Note. (Pls.' Exs. 6 & 7.) Debtor had retained counsel, Attorney Compagni, to represent him in the settlement discussions with Plaintiffs. The parties could not reach an agreement as to the amount due Plaintiffs to offset the damages owed for Debtor's breach of the lease, or for the balance due under the Note. According to Debtor, he could only afford to make monthly payments to Plaintiffs in the amount of $2,000.00, but this amount was unacceptable to Plaintiffs. (Trial Tr. 220–23.) In early October 2016, Plaintiffs then made a counteroffer, which Debtor rejected.[5] Shortly thereafter, on October 22, 2016, Debtor sent letters to the practice's

---

[5] The exact terms of Plaintiffs' counteroffer are unclear to the Court from the record before it, but they do not have any bearing on the Court's determination of either cause of action or the final outcome in this proceeding.

remaining patients informing them that he would be closing the practice and that their records would be available off-site at another location. (Trial Tr. 245–46.)

Plaintiffs then proceeded with the State Court Action and eviction proceeding against Debtor, and Dr. Reddy filed a licensing complaint against Debtor in relation to his transfer of patient records. In addition, in January 2017, Dr. Reddy filed a civil action in state court against Henry Schein, wherein she set forth, *inter alia*, causes of action against Henry Schein for breach of contract, breach of express and implied warranties and of the covenant of good faith and fair dealing, deceptive trade practices and/or false advertising, negligent misrepresentation, negligent infliction of emotional distress, and unjust enrichment. (Def.'s Ex. 3.) In her deposition testimony, Dr. Reddy stated that she was very upset with Henry Schein and its representatives because they told her that Debtor was "a pre-approved client[,] that he was financially fine and everything was okay." (Def.'s Ex. 11, 39.)

IV.   *Arguments*

Plaintiffs argue that two subsections of § 523(a) prevent the Court from discharging the debt due to them by Debtor.[6] First, Plaintiffs assert that they have met the requirements for nondischargeability of the debt under § 523(a)(2)(A) because they have shown that Debtor obtained the practice, use of the premises, and loan from them by virtue of false representations or actual fraud. As the gravamen of their § 532(a)(2)(A) claim, Plaintiffs focus on Debtor's repeated references to Lidiya as his wife during the course of the parties' dealings before entering into the PPA, Lease, Note, and CSA, and his omission of the fact that he was paying child support to Lidiya at that time. Notwithstanding that Debtor and Lidiya are legally divorced, they contend that he

---

[6] During the course of this litigation, neither Plaintiffs nor Debtor acknowledged the separate debts due to Dr. Reddy under the PPA and Note and to Dr. Pratap Reddy under the Lease. Because the Court's analysis is the same for both debts, the Court will follow suit and refer to Plaintiffs' aggregate debt.

repeatedly falsely represented that he and Lidiya would operate the practice together on a full-time basis once he transitioned out of Aspen Dental and into his own dental practice. Plaintiffs also contend that Debtor made false representations regarding his financial affairs and obligations and the loan application process with Bank of America and TD Bank. Plaintiffs argue that Debtor did so with the requisite intent to deceive and induce them into loaning him money, and that they justifiably relied on those representations when they agreed to finance his purchase of Dr. Reddy's practice and extend the Lease to him. (Pls.' Mem. 7–13.) Second, Plaintiffs assert that they have met the requirements for nondischargeability under § 523(a)(6) because they have shown that Debtor intentionally failed to mitigate the damages from his breach of the PPA, Lease, Note, and CSA. Instead, Plaintiffs argue that Debtor willfully and maliciously transferred patient records and destroyed the practice's remaining goodwill, thereby preventing Dr. Reddy from now being able to sell the practice to another dentist and preventing Dr. Pratap Reddy from renting the building, as it is designed and equipped as a dental office. (Pls. Mem. 14–16, 21–22.)

Debtor asserts that Plaintiffs have not satisfied a single element of either § 523(a) claim. Debtor argues that Plaintiffs cannot do so because relief from this type of business failure is precisely contemplated by the Bankruptcy Code and subject to discharge. Simply stated, the resulting debt does not fall within the ambit of § 523(a). Here, as to Plaintiffs' § 523(a)(2)(A) claim, Debtor contends that Plaintiffs have not proven that he made material misstatements or omissions with the intent to deceive them, upon which they in fact relied. Rather, Debtor suggests that his conduct evidences an intent to succeed and to repay Plaintiffs. As to Plaintiffs' § 523(a)(6) claim, Debtor argues that a simple breach of contract, as is the case here, cannot invoke the "willful and malicious injury" exception to discharge under § 523(a)(6). Debtor argues that his conduct cannot be characterized as either willful or malicious because he did not intend to inflict any injury

upon Plaintiffs and, at all times, his actions were motivated not by malice but rather by his personal desire to succeed or to fulfill his professional responsibilities to patients once it became clear that he could not operate the practice.

V.    *Discussion*

A.  *Plaintiffs' Pro Se Status*

Because Plaintiffs have raised their *pro se* status numerous times while prosecuting this adversary proceeding, including during both depositions and trial, the Court is compelled to address the same. Throughout this adversary proceeding, the Court has been mindful that Plaintiffs are self-represented. On May 27, 2017, Debtor filed a Motion to Dismiss the Complaint. (ECF Adv. No. 4.) In ruling on Debtor's Motion to Dismiss, the Court construed Plaintiffs' Complaint and objection liberally in accordance with the Second Circuit's directive to hold *pro se* pleadings to less stringent standards than formal pleadings drafted by lawyers. *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007). As the Court stated during trial, however, a lower standard does not exist when it comes to the rules of evidence and procedure.

While *pro se* litigants are afforded some latitude when it comes to technical procedural requirements, they are not "'exempt . . . from compliance with relevant rules of procedural and substantive law.'" *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983); *Caidor v. Onondaga Cty.*, 517 F.3d 601, 605 (2d Cir. 2008). In fact, as the trial record reflects, the Court quashed Plaintiffs' subpoena issued to Lidiya upon Lidiya's letter request, which the Court treated as a motion, pursuant to Federal Rule of Civil Procedure 45. Thus, "[t]hough a litigant who proceeds *pro se* is entitled to some leniency, due to the fact that [the litigant] did not have the benefit of counsel, . . . [the litigant] is not ultimately relieved of the burden to prove [his or] her case." *Grubin v. Sallie Mae Servicing Corp., L.P. (In re Grubin)*, 476 B.R. 699, 715 (Bankr. E.D.N.Y. 2012). Moreover,

whether or not proceeding *pro se*, the trial strategy and presentation of evidence are squarely within the litigant's control and beyond the purview of the Court. *See Greene v. U.S. Dep't of Educ. (In re Greene)*, Chapter 7 Case No. 10-51071-SCS, APN 11-05016-SCS, 2013 Bankr. LEXIS 1636, at *51 n.17 (Bankr. E.D. Va. Apr. 22, 2013).

      B. *General Law of Nondischargeability*

      The "central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)). The discharge provided to a debtor by the Bankruptcy Code is intended to effectuate this "fresh start" opportunity, but it is reserved for only the "'honest but unfortunate debtor.'" *Id.* (quoting *Local Loan Co.*, 292 U.S. at 244).

      This fresh start policy drives the allocation of the burden of proof in nondischargeability proceedings. *FDIC v. Bacino (In re Bacino)*, Bankruptcy No. 09-20080-LT7; Adversary No. 10-90315-LT, 2014 Bankr. LEXIS 894, at *25 (Bankr. S.D. Ca. Feb. 28, 2014). In order to except its claim from discharge, a creditor bears the burden of proving, by a preponderance of the evidence, that the particular debt falls within one of the exceptions to discharge enumerated in § 523(a). *Grogan*, 498 U.S. at 286–91. This means that the creditor must present evidence "'sufficient to persuade the finder of fact that the proposition is more likely true than not.'" *Bacino*, 2014 Bankr. LEXIS 894, at *25 (quoting *United States v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 654 (9th Cir. B.A.P. 1994)). When determining whether a debt is excepted from discharge, a bankruptcy court must construe the evidence strictly against the creditor and liberally in favor of the debtor. *Signature Bank v. Banayan (In re Banayan)*, 468 B.R. 542, 573 n.285

(Bankr. N.D.N.Y. 2012) (citing *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997) (citations omitted); accord *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996)).

   C. *Plaintiffs' Section 523(a)(2)(A) Claim*

   1. *"False Pretenses, False Representation, or Actual Fraud"*

   Section 523(a)(2)(A) excepts from discharge any debt "for money, . . . or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). "'To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient.'" *Straight Line, LLC v. Madigan (In re Madigan)*, Ch. 7 Case No. 15-31545, Adv. No. 16-50002, 2018 Bankr. LEXIS 1394, at *25 (Bankr. N.D.N.Y. May 8, 2018) (quoting *In re Schwartz & Meyers*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991) (citing 3 Lawrence P. King, Collier on Bankruptcy (MB) ¶ 523.08 at 523–24 (15th Ed. 1990))).

   While § 523(a)(2)(A) includes three separate types of fraud with somewhat different meanings, the United States Supreme Court "has historically construed the terms in § 523(a)(2)(A) to contain the 'elements that the common law has defined them to include.'" *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) (quoting *Field v. Mans*, 516 U.S. 59, 69 (1995)). To establish a fraud claim under federal common law, a plaintiff must prove the following five elements: (1) debtor made a material false representation; (2) *scienter:* debtor made the representation knowing of its falsity; (3) debtor acted with intent to defraud plaintiff; (4) plaintiff justifiably relied on the false representation; and (5) plaintiff suffered damages that were the

proximate cause of plaintiff's reliance. *Madigan*, 2018 Bankr. LEXIS 1394, at \*25 (citing Restatement (Second) of Torts 1976 §§ 525, 546, and 548A (Am. Law Inst. 1976)). Because each type of fraud enumerated in § 523(a)(2)(A) has a specific meaning, however, they must be analyzed individually in light of the facts of the particular case. *Argento v. Cahill (In re Cahill)*, Ch. 7 Case No. 15-72418; Adv. No. 15-08298, 2017 Bankr. LEXIS 501, at \*14 (Bankr. E.D.N.Y. Feb. 22, 2017) (citing *Husky*, 136 S. Ct. at 1586).

For purposes of § 523(a)(2)(A), the term "false pretenses" means "'conscious, deceptive, or misleading conduct calculated to obtain or deprive another of property.'" *Banayan*, 468 B.R. at 574 n.293 (quoting *Indo-Med Commodities, Inc. v. Wisell (In re Wisell)*, Ch. 7 Case No. 810-78537-reg, Adv. No. 811-08163-reg, 2011 Bankr. LEXIS 3112, at \*22 (citing *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000))). It includes "the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective" by the defendant. *Id.* False pretenses, therefore, may be based on an implied misrepresentation or silence in the face of a duty to disclose material facts on which a transaction depends. *Id.* n.195 (citing *Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996) (collecting cases)).

The elements required to establish a debt as nondischargeable under false pretenses are: (1) an implied misrepresentation or conduct by the debtor; (2) promoted knowingly and willingly; (3) to create a contrived or misleading understanding of the transaction on the part of the creditor; (4) which wrongfully induced the creditor to advance money, property, or credit to the debtor. *Id.* n. 292 (citing *Henderson*, 423 B.R. at 621 (citing *Vidomlanski v. Gabor (In re Gabor)*, Ch. 7 Case No. 05-18719 (ALG), Adv. No. 06-01916 (ALG), 2009 Bankr. LEXIS 3110, at \*12 (Bankr. S.D.N.Y. Oct. 8, 2009) (citing *Lubit v. Chase (In re Chase)*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007)))).

Similarly, to prove that a debt arose from false representation, the creditor must show: (1) the debtor made a false or misleading statement; (2) with the intent to deceive; (3) on which the creditor justifiably relied; (4) in order to induce the creditor to turn over money or property to the debtor. *Id.* at 574–75 n. 296 (citing *Henderson*, 423 B.R. at 621 (citing *Gabor*, 2009 Bankr. LEXIS 3110, at *12 (citing *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 500 (Bankr. S.D.N.Y. 1999)))). "The element distinguishing a false representation from a false pretense is an explicit, definable statement by the debtor that results in a misrepresentation. A false pretense, on the other hand is conduct by the debtor that implies or promotes a scheme that is misleading." *Cahill*, 2017 Bankr. LEXIS 501, at *16–17.

Finally, a debt may be excepted from discharge under § 523(a)(2)(A) on the basis of actual fraud, which now may include types of fraud beyond frauds based on a misrepresentation. *Husky*, 136 S. Ct. at 1586. The term "actual fraud" encompasses "'any deceit, artifice, trick, or design involving direct or indirect operation of the mind, used to circumvent or cheat another.'" *Banayan*, 468 B.R. at 577 n.306 (citing *Henderson*, 423 B.R. at 621 (citing *Gabor*, 2009 Bankr. LEXIS 3110, at *12 (citing *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 12 n.3 (Bankr. S.D.N.Y. 2002)))).

"Despite the distinctions between the three types of fraud, some of the underlying elements overlap under § 523(a)(2)(A)." *Cahill*, 2017 Bankr. LEXIS 501, at *18 (citing *Husky*, 136 S. Ct. at 1588). These include scienter, reliance, and materiality. Each of these elements bears a brief discussion in its own right before being applied to the facts at hand.

*a. Scienter*

For purposes of § 523(a)(2)(A), the creditor must prove scienter by showing that, at the time the debt was incurred, the debtor lacked the intent to repay the obligation. *Banayan*, 468 B.R. at 576 n.309 (citing *EDM Machine Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854

(Bankr. N.D. Ohio 2003) (citing *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d

391, 403 (5th Cir. 2001); *Binger v. Bloomfield*, 293 B.R. 148, 153 (Bankr. N.D. Ohio 2003))).

The standard is a subjective one, and it may be satisfied by proof of either actual intent or

a reckless disregard for the truth. Since direct proof of state of mind is rarely available, scienter

can be inferred. *In re Balzano*, 127 B.R. 524, 531 (Bankr. E.D.N.Y. 1991). Such inference is

negated, however, where a debtor makes payments to a lender and files bankruptcy only after he

can no longer do so and is unsuccessful in negotiations with the lender to reduce the payments. *Id.*

### b. Reliance

The Supreme Court has held that a minimal, justifiable reliance standard applies in a §

523(a)(2)(A) case. *Field*, 516 U.S. at 74–75. Under this standard, the creditor is not required to

conduct an examination or investigation unless, under the circumstances and from a cursory

glance, the facts should be apparent to one of his knowledge and intelligence, or he has discovered

something that should serve as a warning that he is being deceived. *Id.* at 70–72. The creditor must

prove both actual and justifiable reliance, keeping in mind that "the greater the distance between

the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact."

*Id.* at 76.

### c. Materiality

The Second Circuit has not reviewed the proper standard for materiality under §

523(a)(2)(A). As a recurring guidepost for materiality, however, case law often relies on the

Restatement (Second) of Torts § 551 (1977). *Bacino*, 2014 Bankr. LEXIS 894, at *48.

For facts to be material, the Restatement requires that there be a duty to disclose:

(a) Facts which the other is entitled to know based on the parties' relationship;
(b) Facts which, if not disclosed, may be misleading;
(c) Facts which are subsequently acquired which a party knows will make
    untrue or misleading a previously understood representation;

(d) Facts about which a party made representations without the expectation of them being acted on, subsequently learns the other is going to act in reliance on those facts;

(e) And when the other party is about to enter the transaction under a mistake as to facts which are basic to the transaction, and the other party, because of the relationship between them, would reasonably expect disclosure of those facts.

*Id.*

In order for a fact to be material, it must have played a substantial part and, thus, have been a substantial factor, in influencing the creditor's decision. *See, e.g., North Shore Cmty. Bank & Trust Co. v. Carlson (In re Carlson)*, Case No. 08-B-22322, Adv. No. 09-A-00231, 2011 Bankr. LEXIS 654, at *18 (Bankr. N.D. Ill. Feb. 10, 2011) (citing *Mercer*, 246 F.3d at 413); *see also, Green v. Salvatore (In re Salvatore)*, Case No. 10-16449/JHW; Adv. No. 10-01679, 2011 Bankr. LEXIS 2091, at *33–34 (Bankr. D. N.J. May 26, 2011) (citing *Evans v. Dunston*, 146 B.R. 269, 275 (D. Colo. 1992) ("The false representation must be sufficiently material to have caused the plaintiff to act where she would not have done so had she known the truth")). "While it is certainly not practicable to require the debtor to 'bare his soul' before the creditor, the creditor has the right to know those facts touching upon the essence of the transaction." *In re Van Horne*, 823 F.2d 1285, 1288 (8th Cir. 1987).

*2. Analysis*

This case involves a commercial contract dispute between parties that were introduced and brought together by Henry Schein in its capacity as a broker, whose services failed to meet the expectations of any of the parties. All of the parties involved made decisions based upon Henry Schein or Bambrick's advice, which in hindsight, now appear to have been ill-advised. As a result, Plaintiffs and Debtor suffered financial losses. Yet a breach of contract does not, by itself, render Plaintiffs' resulting damages claim nondischargeable under § 523(a)(2)(A).

Under the facts and circumstances of the case, the Court cannot conclude that the requisite elements of materiality, reliance, or intent have been met. Plaintiffs allege that Debtor misrepresented his marital status during the parties' negotiations, and that his alleged marriage to Lidiya was a principal consideration in their decision to accept his offer and to finance the purchase. In fact, they suggest that but for this misrepresentation, they would not have accepted his offer to purchase the practice or agreed to finance the purchase. Other than their testimony at trial, the record bears no evidence that the purchaser's marital status was material to either the sale or financing.

As argued in Debtor's Memorandum, few courts have addressed the issue of whether a debtor's marital status is material in the context of a § 523(a)(2)(A) proceeding, and only one has answered this inquiry affirmatively. *Compare Van Horne*, 823 F.2d 1285 (finding materiality where the debtor's relationship with the creditor's daughter, a woman who he intended to divorce, was the "*raison d-etre*" for the renewal of credit), *with Parker v. Grant (In re Grant)*, 237 B.R. 97 (Bankr. E.D. Va. 1999) (rejecting plaintiffs' argument that the debtor's marital misrepresentation was the "*sine qua non*" and, thus, failing to find materiality with respect to debtor's marital status in a residential lease transaction). Given the nature of the transaction and the involvement of Henry Schein as experts and an intermediary to the transition of the practice from one dentist to another dentist, the Court does not find the prospective purchaser's marital status to have been material to Plaintiffs' business determinations or, more specifically, the parties' sale transaction.

Even if this Court found otherwise, the evidence strongly suggests that there was no reliance by Plaintiffs on Debtor's misrepresentation of Lidiya as his wife rather than as his ex-wife. Reddy's deposition testimony, which is more plausible than her trial testimony on this point because of its proximity to the failed business transaction, shows a lack of reliance on any

representations made by Bambrick or Debtor about his relationship with Lidiya. When asked during her deposition what she would have done differently if Debtor had told her directly that he and Lidiya were divorced during their initial meeting, Dr. Reddy answered, "I don't think it would have made any difference to me at that time because it's his personal life. I have nothing to do with that. You're coming to buy my practice.  It's up to you. Whatever your personal life is, is your personal life." (Def.'s Ex. 11, 75.) It was not until after Plaintiffs and Debtor had entered into the PPA, Lease, Note, and CSA that Plaintiffs became fixated on Debtor's marital circumstances. Their decision to sell the practice and rent the premises to Debtor, as well as to finance the sale, appears to have been founded upon Debtor's ability to practice dentistry and care for the practice's existing patients, as well as his creditworthiness, notwithstanding the differences in Dr. Reddy and Debtor's business philosophies and the fact that Henry Schein's recommended banks had already denied his business loan applications.

Finally, the Court finds that Debtor lacked the requisite fraudulent intent in his dealings with Plaintiffs. "The issue of intent requires actual or positive intent." *Salvatore*, 2011 Bankr. LEXIS 2091, at *39 (citing *N.J. DOL & Workforce Dev. V. Carey (In re Carey)*, Chapter 7 Case No. 08-24396, Adv. No. 08-2934, 2010 Bankr. LEXIS 970, at *1 (Bankr. D.N.J. Mar. 11, 2010)). For purposes of § 523(a)(2)(A), scienter requires a showing that, at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation. *Banayan*, 468 B.R. at 576 n.309 (citing *Harrison*, 301 B.R. at 854 (citing *Mercer*, 246 F.3d at 403; *Binger v. Bloomfield*, 293 B.R. 148, 153 (Bankr. N.D. Ohio 2003))). Because intent to defraud or deceive is rarely admitted, it may be established by circumstantial evidence or inferred from the surrounding facts and circumstances of the case. *Id.* n.311 (citing *Desiderio v. Parikh (In re Parikh)*, 456 B.R. 1, 34 (Bankr. E.D.N.Y. 2011) (citing *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R.

560, 572–73 (E.D.N.Y. 2000)). Accordingly, the debtor's credibility is an important factor in finding or rejecting the same. *Id.* n.312 (citing *In re Magnusson*, 14 B.R. 662, 669 (Bankr. N.D.N.Y. 1981) (citing cases)).

Preliminarily, the Court notes that Debtor was a credible witness. Debtor's testimony during his deposition and at trial, together with the record as a whole, convince the Court that he did not harbor an improper motive in his dealings with Plaintiffs. Debtor testified that it was his dream to own and operate his own dental practice in the United States. Given his admitted lack of business acumen, Debtor trusted Henry Schein's representations that Dr. Reddy's practice would be a turn-key operation. According to Debtor, this was inaccurate as the practice was outdated and would have required a significant investment to modernize the equipment necessary for the type of practice Debtor envisioned. Perhaps even more detrimental to Debtor's success, and as shown by Dr. Reddy's decline in income prior to the sale, the practice was far from thriving due to the publicity of Dr. Reddy's disciplinary proceeding. (Ex. 11, 14–16.) While Debtor did not make any improvements to the practice, he did make payments to Plaintiffs under both the Note and Lease prior to his default, which he testified occurred after he depleted his savings and he could no longer work multiple jobs to support the monthly payments to Plaintiffs. Even after his default, Debtor attempted to resell the practice and to negotiate repayment terms to Plaintiffs for the shortfall between his offer and Dr. Nolan's offer, which Plaintiffs ultimately rejected. Thus, an examination of the traditional indicia of fraud, including whether Debtor undertook any significant measures toward the performance of his obligations, compels the Court to find in his favor.

   D. *Plaintiffs' Section 523(a)(6) Claim*

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "The terms

willful and malicious are separate elements, and both elements must be satisfied." *Vyshedsky v. Soliman (In re Soliman)*, 539 B.R. 692, 698 (Bankr. S.D.N.Y. 2015) (internal quotation marks and citations omitted). "To establish that a debtor acted willfully under § 523(a)(6), the plaintiff must demonstrate that the injury in question was a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998). To establish that a debtor acted maliciously, the plaintiff must prove that the debtor's act was "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996) (collecting cases).

"The heart of any action under § 523(a)(6) is the debtor's intent to injure the plaintiff." *Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004). For that reason, commercial contract disputes do not fit comfortably into the rubric of a § 523(a)(6) nondischargeability action based on willful and malicious injury. *Id.*

Here, Plaintiffs' sole allegation in support of their § 523(a)(6) claim is that Debtor acted willfully and maliciously when he violated the CSA by transferring the medical records off-site to a different dental practice and informed the patients that they could obtain their records at that alternate location, which Plaintiffs repeatedly asserted also violated his professional duties and federal law. Plaintiffs' believed that this destroyed any remaining goodwill associated with the dental practice and, in turn, their ability to sell or rent the premises to another professional.

This occurred, however, after Dr. Pratap Reddy commenced an eviction proceeding against Debtor, and after Debtor rejected Plaintiffs' final offer to mitigate damages in relation to the proposed sale of the practice to Dr. Nolan. While this Court does not take a position as to whether the transfer occurred in compliance with the Health Insurance Portability and Accountability Act

of 1996, Pub. L. No. 104–191 (1996), even if it did not, the illegality of an action does not render it willful and malicious for purposes of § 523(a)(6). *Westfall v. Glass (In re Glass)*, 207 B.R. 850, 857 (Bankr. E.D. Mich. 1997). Under the facts and circumstances presented, the Court does not find evidence of tortious conduct by Debtor. Because § 523(a)(6) requires significantly more than a breach of contract or failure to comply with a known duty, the Court is again compelled to find in Debtor's favor.

*VI.    Conclusion*

For the reasons set forth herein, although the Court's decision in this proceeding may seem harsh, particularly in light of what Plaintiffs' have endured thus far with respect to Dr. Reddy's exit from her profession, the Court is constrained to hold that Plaintiffs failed to carry their burden sufficient to establish that the debt owed to them by Debtor is nondischargeable under § 523(a). Accordingly, the Court will enter a separate judgment consistent with this Memorandum-Decision and Order dismissing Plaintiffs' Complaint.

Accordingly, it is now

ORDERED, that Plaintiffs' Complaint is dismissed.

Dated:  September 28, 2018
        Utica, New York

/s/Diane Davis
DIANE DAVIS
United States Bankruptcy Judge